THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | No. 19 CR 578-1 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| ROOSEVELT MCDONALD, | ) | |
| | ) | |
| *Defendant.* | ) | |

**MEMORANDUM OPINION & ORDER**

Defendant Roosevelt McDonald is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). This charge resulted from an encounter with Chicago Police Department Officers on February 18, 2019. Officers responding to a ShotSpotter report of gunfire observed McDonald retreating into the relevant address and recovered spent shell casings and a live round of ammunition in the place he was standing. Officers executed a search of the apartment into which McDonald retreated as well as of a storage crawlspace adjacent to his apartment. Officers recovered a box of ammunition and two handguns. McDonald moves to suppress the evidence obtained as a result of the encounter arguing the warrantless search and seizure violated his Fourth Amendment rights. (Dkt. 28).

At the October 30, 2020, evidentiary hearing, parties presented the testimony of Ronald Wilson, Chicago Police Department Officers John Foertsch, Michael O'Brien, and Michel Higgins, and body-camera footage of the events in question. The parties were given the opportunity to submit post-hearing briefing. After reviewing

the testimony and evidence presented at the hearing, the Court denies McDonald's motion to suppress. (Dkt. 28).

## BACKGROUND

At approximately 9:40 p.m. on February 18, 2019, ShotSpotter detected gunfire at 7414 South Stewart Avenue, Chicago, IL ("7414 Stewart"), an apartment building. (Dkt. 29 at 1–2; Dkt. 40 ¶ 3). Shortly thereafter, at 9:43 p.m., three Chicago Police Department Officers patrolling the South Side of Chicago arrived at 7414 Stewart and observed McDonald standing partially on the front porch of the apartment building wearing a dark jacket and a hat. (GX-2 at 3:20). Officers illuminated McDonald with a flashlight and, according to Officer Foertsch's testimony, announced themselves, at which point McDonald retreated into the vestibule of 7414 Stewart and entered a basement apartment. (GX-2 at 3:20–:27).

Officers approached the front porch of 7414 Stewart and knocked on the locked door of the vestibule. (GX-2 at 3:30–:45). Officers Foertsch and Higgins testified they observed two spent .380 caliber shell casings and a live .380 caliber round of ammunition on the front porch, which they recovered. (GX-3A; GX-3B).

Antaniqua McClellan emerged from the basement apartment and opened the vestibule door of 7414 Stewart at approximately 9:45 p.m. and, according to Officer Foertsch, appeared "shocked" to see the spent shell casings and live ammunition on the porch. (GX-2 at 4:53). Officer Foertsch told McClellan he was responding to a ShotSpotter call and described the man he saw run into the basement apartment. (Tr. 27:1–8). McClellan replied that she lived in the basement apartment with her

2

husband but that she was the only one home. (Tr. 112:14–17). Officer Higgins asked McClellan if they could "look to make sure nobody else was in the apartment" to which McClellan responded "Yes, but let me get my keys from my vehicle and I'll let you in." (Tr. 95:23–25). McClellan retrieved the keys to the basement apartment from her car and told Officer Higgins that she only wanted him to come into the apartment. (GX-2 at 5:18–6:54) (Tr. 96:9–15). Higgins replied that, due to safety concerns, he could not enter the apartment alone. (Tr. 96:14–15). At this point, at approximately 9:47 p.m., McClellan used the key she retrieved from her car to unlock the door to the basement apartment and let Officer Higgins, Officer Foertsch, and Officer Kennedy inside. (GX-2 at 5:18–6:54) (Tr. 96:19–24). Officers had neither a search warrant for the apartment nor an arrest warrant for McDonald. (Dkt. 28 ¶ 3) (Tr. 79:19–21).

Officers entered the basement apartment of 7414 Stewart and Officer Foertsch performed a protective sweep to ensure there was no active shooter. (Tr. 46:7–11). Officer Foertsch recovered a partial box of .380 caliber ammunition with 11 live rounds inside the box. (Tr. 34:21–35:22; 36:1–13). The box of ammunition was located on the living room table next to McDonald's driver's license and mail. (GX-4A) (GX-12).

Officer Higgins moved to the back of the basement apartment and opened a door leading to an enclosed rear porch area with a common staircase leading to other units. (Tr. 97:12–25). Within the rear porch area is a crawlspace with three entrances. One entrance leads to 7414 Stewart's backyard and is boarded up with plywood, one entrance has an unsecured plywood door and opens next to the common

3

staircase, and a third entrance is perpendicular to the basement apartment rear door and consists of a hole in the wall three to four feet above the floor. (GX-6 at 1:38, 5:40, 11:00–:15) (GX-7). Officer Higgins saw McDonald jumping down from this third crawlspace entrance and move towards the common staircase. (Tr. 98:2–17).

Contemporaneously, other CPD Officers, including Officer O'Brien, circled to the rear of 7414 Stewart, announced themselves as police, and positioned themselves in the building's backyard. (GX-2 at 4:00–:39) (GX-6 at 1:22). Officer O'Brien heard noises coming from the crawlspace and said, "someone's down there" and expressed suspicion that McDonald hid a gun in the crawlspace. (GX-6 at 1:38, 1:50, 2:18, 3:08, 4:45, 5:09–:17). Officer Higgins let those Officers at the rear of 7414 Stewart, including Officer O'Brien, into the apartment building through the rear door. (GX-6 at 4:36).

At this point, in addition to several Officers, McClellan and McDonald were in the 7414 Stewart enclosed rear porch area. McDonald was no longer wearing a dark jacket and was covered in dust and cobwebs. (GX-6 at 17:35–:50). When Officer O'Brien declared his intention to search the crawlspace, McClellan announced, "This is my landlord's property, so please don't go through his stuff" and referred to McDonald as her husband. (GX-6 at 5:15–:40, 9:36–:42, 10:05–:10). At the time, McClellan was on the phone with an unknown person, to whom she stated "I let 'em in because I seen shells on the porch . . . that's why I let 'em in." (GX-6 at 5:15–:40).

Officer O'Brien entered the crawlspace through the third entrance and searched the area for several minutes. (GX-6 at 5:40–9:36). The crawlspace was

4

"completely cluttered with tools and buckets and pipes and [] miscellaneous things." (GX-6 at 5:40–9:36) (Tr. 70:3–5). Officer O'Brien abandoned his search of the crawlspace once he started cramping up and because he did not find any firearms. (GX-6 at 5:40–9:36). McClellan said to Officer O'Brien, "Man, you messing up all these people's shit." (GX-6 at 9:40–:50).

Officers placed McDonald in handcuffs and expressed concern that an unaccounted-for gun was nearby. (GX-6 at 11:20). At this point, McDonald referred to McClellan as his wife and told Officers that someone had shot at him outside with a silver and black .380 caliber firearm and he called 911 in response. (GX-6 at 4:55–5:05, 9:42–:48, 12:00–:20). Shortly thereafter, Officer Higgins resumed searching the crawlspace for about five minutes before locating a 9 mm black Glock semiautomatic handgun and a .380 caliber black Cobra semiautomatic handgun. (GX-8) (GX-9) (Tr. 121:4–7). The guns were in the ceiling of the crawlspace and fell after Officer Higgins manipulated a loose area of the ceiling's sheathing. (GX-7) (Tr. 105:14–25). Officer Higgins estimates approximately 35 minutes elapsed between McDonald retreating into 7414 Stewart and recovering the handguns. (Tr. 123:5–10).

Once the handguns were recovered, McDonald was placed under arrest, transported to the police station, and read his *Miranda* rights. (Dkt. 29 at 4). On July 16, 2019, the Government charged McDonald with one count of being a felon in unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Dkt. 1).

McDonald moved to suppress the recovered box of ammunition and firearms on January 3, 2020.[1]  (Dkt. 28).

## DISCUSSION

### I.     The Box of Ammunition

"As a rule, the Fourth Amendment requires the government to get a warrant before searching someone's property."  *U.S. v. Terry*, 915 F.3d 1141, 1144 (7th Cir. 2019) (citing U.S. CONST. Amend. IV and *U.S. v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)).  Even warrantless searches within a home are constitutionally permissible if they fall within an established exception.  *U.S. v. Mojica*, 863 F.3d 727, 731 (7th Cir. 2017) (citing *U.S. v. Henderson*, 563 F.3d 776, 779 (7th Cir. 2008)).  One such exception is a warrantless search pursuant to voluntary consent given by one with actual or apparent authority to do so.  *Mojica*, 863 F.3d at 731 (citing *U.S. v. Wright*, 838 F.3d 880, 884 (7th Cir. 2016)); *see also Conner v. Vacek*, 606 Fed. Appx. 485, 488 (7th Cir. 2020) ("[A] search conducted with the consent of a person with apparent authority over a property is a well-recognized exception.").  Apparent authority exists where "the facts available to an officer at the time of the search would allow a person of reasonable caution to believe that the consenting party had authority" over the property in question.  *Mojica*, 863 F.3d at 732 (citing *U.S. v. Ryerson*, 545 F.3d 483, 489 (7th Cir. 2008)); *see also Terry*, 915 .3d at 1145 (quoting *U.S. v. Alexander*, 573 F.3d 465, 474 (7th Cir. 2009) ("To determine whether the officers' belief was

---

[1] While McDonald also moved to suppress any statements made during the search, the Government does not intend to introduce any such statements as evidence.  (Dkt. 29 at 16).

reasonable, we consider 'what the officers knew *at the time they sought consent*, not facts that came to light after the search began.'") (emphasis in original).

The Government presented sufficient evidence that McClellan consented to the search of the 7414 Stewart basement apartment and that, at minimum, she had the apparent authority to do so. Officer Higgins testified McClellan consented to a search of the basement apartment, and McDonald does not contest this point. (Tr. 95:23–25). That McClellan consented to a search is corroborated by the fact that she retrieved her keys to allow Officers into the basement apartment and by her subsequent statement, captured on Officer O'Brien's bodyworn camera, that she "let 'em in[.]" (GX-2 at 5:18–6:54) (GX-6 at 5:15–:40) (Tr. 96:9–15).

The Officers reasonably believed McClellan was authorized to consent to a search based on her apparent "joint access or control" of the basement apartment. *Terry*, 915 F.3d at 1145 (citing *Ryerson*, 545 F.3d at 487). Officer Foertsch testified McClellan emerged from the basement apartment and stated she lived in the apartment with her husband.[2] (Tr. 25:19–20, 112:14–17); *see Conner*, 806 Fed. Appx. at 489 ("Factors we consider in evaluating the reasonableness of an officer's belief that someone has authority over a premises include whether that person . . . says they reside there[.]"). McClellan also informed the Officers she had keys to the basement apartment, which she retrieved from her car and used to let them inside.

---

[2] Although unknown to the Officers at the time consent was given, and therefore insufficient in isolation to establish McClellan's authority to authorize a search, both McClellan and McDonald subsequently referred to each other as husband and wife, respectively. (GX-6 at 9:36–:42, 10:05–:10, 12:00–:20). These later statements, captured on bodyworn camera, offer corroborative evidence McClellan referred to McDonald as her husband at the time she gave consent.

7

(GX-2 at 5:18–6:54) (Tr. 95:23–25, 96:19–24); *see Conner*, 806 Fed. Appx. at 489 (finding a woman had apparent authority to consent to a search of an apartment where, in addition to other indicia, she had a key to the apartment); *see also U.S. v. Richards*, 741 F.3d 843, 850 (7th Cir. 2014) ("[P]ossession of a key is a sign of actual authority over a room.").

McDonald suggests the box of ammunition should be suppressed because McClellan only consented to a protective sweep of the basement apartment, McClellan withdrew her consent before the box of ammunition was recovered, and her consent was involuntary. (Dkt. 40 ¶ 6; Dkt. 79 at 4). Even imagining McClellan limited the scope of her consent to a protective sweep of the basement apartment (and none of the evidence offered suggests she did so), the box of ammunition was in plain view on the living room table. *See Maryland v. Blue*, 494 U.S. 325, 327 (1990) (stating a protective sweep encompasses "a cursory visual inspection of those places in which a person must be hiding"); (Tr. 34:21–35:22; 36:1–13). Neither has McDonald identified any "unequivocal act or statement" by McClellan withdrawing consent. *U.S. v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 820 (7th Cir. 2013). As to voluntariness, the Government must prove McClellan gave consent voluntarily by a preponderance of the evidence. *Richards*, 741 F.3d at 847–48 (quoting *U.S. v. Grap*, 403 F.3d 439, 445 (7th Cir. 2005)). Courts evaluate voluntariness based on the totality of the circumstances, including (1) the age, education, and intelligence of the consenting party; (2) whether the consenting party was advised of her constitutional rights; (3) the length of the detention prior to consent; (4) whether the consenting

8

party consented immediately or police made repeated requests for consent; (5) whether physical coercion was used; and (6) whether the consenting party was in custody. *U.S. v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018). Based on the evidence presented at the suppression hearing and described above, none of these factors suggest McClellan's consent was involuntary. Nor does McDonald present facts supporting the opposite conclusion.

The box of ammunition was recovered in plain view pursuant to consent granted by one with apparent authority over the 7414 Stewart basement apartment. McDonald's motion to suppress the box of ammunition is denied.

## II. The Handguns

As Officers gained access to 7414 Stewart based on McClellan's consent, the issue with respect to the recovered handguns is whether McDonald had a Fourth Amendment interest in the crawlspace of 7414 Stewart. Tenants of apartment complexes do not have Fourth Amendment rights to apartment common areas. *U.S. v. Sweeney*, 821 F.3d 893, 900 (7th Cir. 2016); *see also U.S. v. Nunez-Hurtado*, 17 CR 608 (N.D. Ill. Jun. 10, 2019), Dkt. 51. The relevant question, then, is whether McDonald enjoyed exclusive control over the crawlspace. *U.S. v. Correa*, 908 F.3d 208, 218 (7th Cir. 2018).

The crawlspace is physically exterior to the 7414 Stewart basement apartment and located within a common area. (GX-7) (Tr. 131:3–6). Wilson, the landlord of 7414 Stewart, testified the crawlspace was where "everybody stores stuff" and is accessible for use by "the whole building." (Tr. 131:11–12, 136:7–18, 138:14–17). McClellan's

statements to Officer O'Brien that "[t]his is my landlord's property, so please don't go through his stuff" and "[m]an, you are messing up all these people's shit" supports the conclusion that all the tenants of 7414 Stewart enjoyed access to and use of the crawlspace. (GX-6 at 5:15–:40, 9:36–:50). The crawlspace was not secured with a lock at any point during McDonald's residence at 7414 Stewart, including the night of February 18, 2019. (Tr. 136:15–16, 137:2–9, 138:11–13, 149:6–20). Finally, the crawlspace was not partitioned or divided in such a way as to indicate specific areas were reserved for use by individual tenants. (GX-6 at 5:40–9:36) (Tr. 70:3–5). McDonald did not enjoy exclusive control over the crawlspace and, therefore, does not have a protectable Fourth Amendment interest.

McDonald's motion to suppress the handguns is denied.

## CONCLUSION

For the foregoing reasons, McDonald's motion to suppress is denied. (Dkt. 28). Pursuant to 18 U.S.C. § 3161(h)(1)(D), time is hereby excluded for the review of pretrial motions.

_____
Virginia M. Kendall
United States District Judge

Date: July 23, 2021

10